**\*FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____

RAYMOND and REYLENE STAREGO,
individually and as guardians on
behalf of their son, ANTHONY STAREGO,

Plaintiffs,

v.

NEW JERSEY STATE INTERSCHOLASTIC
ATHLETIC ASSOCIATION, et al.,

Defendants.

_____

Civil No. 13-3172 (FLW)

**OPINION**

**WOLFSON, United States District Judge**:

The Court is confronted with the difficult question, at this injunctive relief stage, whether Anthony Starego ("Anthony"), the autistic son of Raymond and Reylene Starego ("Plaintiffs"), should receive a waiver to play a fifth year of competitive football at Brick Township High School ("Brick"). Defendants, the New Jersey State Interscholastic Athletic Association (the "Association"), the New Jersey Department of Education, Christopher Cerf, in his representative role as Commissioner of Education of the New Jersey Department of Education (the "Commissioner") (collectively, "Defendants"), denied Anthony a waiver to continue to play competitively for the Brick football team since he is no longer eligible based on the Association's age and eight semester rules. The Association's initial decision was confirmed by the Commissioner. Plaintiffs bring this case under the Americans with

Disabilities Act (the "ADA"), challenging the Association's decision to deny Anthony the opportunity to play competitive football, a sport that has, undoubtedly, helped Anthony flourish academically, as a student with disabilities, and has strengthened his confidence and self-esteem.

The high school football season is impending, and Plaintiffs move to preliminarily enjoin Defendants from denying Anthony the right to play competitively on the Brick football team for one more year in the position as place kicker. In addition to the papers filed by the parties, a hearing, wherein testimony was presented, was held on August 14, 2013. For the reasons set forth below, I reach the difficult decision to deny Plaintiffs' motion, because under the strictures of the ADA, Anthony has received the equal opportunity and access to play football, as he meaningfully participated in Brick's football program for four consecutive years.

## BACKGROUND

The following facts are not in dispute and they are derived from the record before this Court on this preliminary injunction motion. Anthony turned nineteen years old in June 2013, and he began his fifth year at Brick high school in September 2013. See Mayerson Decl., ¶ 3. He has been diagnosed with autism, attention deficit hyperactivity disorder and cognitive impairments, which qualify Anthony for an individualized education program ("IEP"). Id. at ¶ 6. In that connection, Anthony is eligible to continue to attend school until the age of twenty-one. Id. at ¶ 7. Anthony joined the

Brick football team beginning in his freshman year in September 2009. He has played continuously for four years; however, he did not become the starting varsity place kicker until midway through the 2012 football season, his senior year. See Id. at ¶ 8.

The Association is a voluntary, non-profit organization, comprised of boards of education of local public school districts and private schools in New Jersey, that oversees athletic competition among member schools, such as Brick. Among its various roles, the Association promulgates eligibility rules that are essential for regulating and structuring high school sports. See N.J.S.A. 18A:11-3. One of the two rules at issue here is the eight semester rule, which states: "No student shall be eligible for high school athletics after the expiration of eight consecutive semesters following his/her entrance into the 9th grade." NJSIAA Bylaws, p. 35. The rule further states that "[c]lassified students who are ungraded will have eight consecutive semesters of eligibility beginning with the first semester of participation in interscholastic athletics at the freshman, junior varsity, or varsity level." Id. at p. 36. The second rule at issue is the age rule. This rule states: "An athlete becomes ineligible for high school athletics if he/she attains the age of nineteen prior to September 1. However, any athlete attaining age nineteen on or after September 1 shall be eligible for the ensuing school year." Id. at p. 31. According to the Interpretive Guidelines of the Association's rules, the purposes of the age and eight semester rules, in essence, are to (1) prevent

red-shirting - the practice of holding a student back a grade to gain a competitive advantage, (2) prevent students from displacing other students on the sports team, (3) maintain a uniform progression through the four grades of high school, (4) provide all students with equal opportunity to play interscholastic sports, and (5) act as a safety measure. Id. at p. 46-47.

Students may apply for a waiver of these eligibility rules. The waiver process provides students an avenue to challenge the applicability of a rule, or rules, based on the student's individual circumstances. Indeed, waivers are "intended to equalize opportunity among otherwise eligible students who cannot strictly comply with the eligibility rules because of circumstances beyond their control." See NJSIAA Bylaws, p. 49. Two Association committees make waiver decisions - the Eligibility Committee and the Eligibility Appeals Committee. Id.

In June 2013, Anthony turned nineteen, and according to the age rule, he was no longer eligible to play high school football. Similarly, because Anthony has participated in Brick's football program for four years, he was also precluded from playing on the team under the eight semester rule. In that regard, in anticipation of Anthony's ineligibility, Plaintiffs, with the assistance of Brick, applied for a limited waiver in February 2013.[1] On March

---

[1]

Plaintiffs only sought a one-year waiver and have represented that they will not seek any further years of football eligibility for Anthony beyond that one year.

11, 2013, the Appeals Committee held a hearing wherein school staff and others,[2] along with Anthony and his parents, attended to provide the Committee with testimonial and documentary evidence in order to establish that a waiver was necessary. Based on the presentation of Plaintiffs' evidence, the Association concluded that Anthony did not qualify for the waiver. In summarizing its findings, the Association explained:

> Here, the student does not qualify for a waiver because he has already received the full benefit of participation in high school sports; as a proven difference-maker who is a college-level kicker his continued participation would provide his team with an actual advantage against other teams; his participation would deny other students their opportunity to participate; and, because the EAC [the Association] could not rule out the safety concerns addressed by the Age Rule. Changing the rules in this case would fundamentally alter the competition.

Association Decision, p. 5.[3] However, recognizing that Anthony benefits tremendously from playing football from a developmental standpoint, the Association permitted Anthony to participate in team practices and scrimmage games in the upcoming season. Plaintiffs appealed the adverse decision to the Commissioner pursuant to N.J.S.A. 18A:11-3. In a written

---

[2]
       Those who testified included: Dennis Fillipone, the principal at Brick; Robert Dahl, the head football coach at Brick; Peter Bell, Autism Advocate and Executive Vice President, Autism Speaks; Karen Wall, newspaper reporter; Robert Powers, a teacher at Brick; Lee McDonald, Anthony's personal football coach; Anthony Starego; and, Plaintiff, Mr. Ray Starego.

[3]
       The specific factual findings of the Association and the Court's treatment of those findings will be discussed more fully, infra.

opinion, which deferred to the Association's factual findings, the Commissioner affirmed the Association's decision on June 28, 2013.

Plaintiffs brought the instant suit under the ADA to challenge the Association's denial. According to Plaintiffs, the Association violated the ADA by refusing to provide reasonable accommodations by way of a waiver to permit Anthony, a disabled student, to continue to play football competitively for Brick.[4] Because the upcoming football season begins competitive play on September 13, 2013, Plaintiffs move for emergent relief to enjoin Defendants from denying Anthony the opportunity to play for the team for one more year.

## DISCUSSION

### I. Standard of Review for Preliminary Injunction

It is well-settled in this circuit that a party seeking a preliminary injunction must show: (1) a likelihood of success on the merits; (2) that he will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief. Conestoga Wood Specialties Corp. v. Sec'y of the U.S. Health and Serv., No. 13-1114, 2013 U.S. App. LEXIS 15238, at *11-12 (3d Cir. Jul. 26, 2013); Kos Pharms. Inc. v. Andrx Corp., 369 F.3d 700, 708 (3d Cir. 2004). The Third Circuit has instructed,

---

[4]    To be clear, this case is not brought under the Individuals with Disabilities Act (the "IDEA"). Rather, Plaintiffs clarified during the hearing that they are solely bringing a claim under Title II of the ADA. See Tr., T5:15-14.

and recently reconfirmed, that a plaintiff seeking an injunction must meet all four criteria, as "[a] plaintiff's failure to establish any element in its favor renders a preliminary injunction inappropriate." NutraSweet Co. v. Vit-Mar Enters., Inc., 176 F.3d 151, 153 (3d Cir. 1999); see Conestoga, 2013 U.S. App. LEXIS 15238, at *11.

## II.    Americans with Disabilities Act

As the likelihood of success is the pivotal factor in this case, I will turn to a discussion of Plaintiffs' claims under Title II of the ADA. Section 12132 of Title 42 of United States Code prohibits discrimination based upon a disability by state and local government, and it provides, in part, that:

> no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132. While this section is broad in scope, in the context of high school sports, its application has long been the subject of a spirited debate amongst the courts in the country. Notably, the Third Circuit has not had an occasion to weigh in on the legal issues presented in this case. A discussion of the case law related to the Act as it pertains to the issues concerning this case follows.

Prior to the Supreme Court's decision in PGA Tour, Inc. v. Martin, 532 U.S. 661 (2001), courts were split on the question whether Title II of the ADA requires individualized review for student-athletes with disabilities who petition for certain waivers. In the first seminal case of its kind, Pottgen v.

<u>Missouri High Sch. Athletic Ass'n</u>, 40 F.3d 926 (8th Cir. 1994), held that under the ADA, a disabled student who surpasses the age requirement is not a "qualified individual with a disability" because the student does not meet the sport program's "essential eligibility requirement." <u>Id.</u> at 930-31. In other words, based on this line of reasoning, the circuit court held that age would always be an essential or necessary requirement for high school athletics. <u>Id.</u> In that regard, <u>Pottgen</u>, and its progeny, held that enforcing age limit rules is not discriminatory because the limits are based only on the neutral factor of age, and as such, they apply equally to disabled and non-disabled students. <u>See</u> <u>Sandison v. Michigan High Sch. Athletic Ass'n, Inc.</u>, 64 F.3d 1026 (6th Cir. 1995) (concluding that disabled students were excluded from playing sports by reason of age, pursuant to the school's age requirement rule, not because of their disability).

On the other side of the coin, the Seventh Circuit, in another seminal case, <u>Washington v. Indiana High Sch. Athletic Ass'n</u>, 181 F.3d 840 (7th Cir. 1999), disagreed with the majority in <u>Pottgen</u> by explaining that although an age limit might be considered neutral with respect to disabled and non-disabled students, the application of the age requirement to a disabled student would constitute discrimination in instances where the student's disability was the only reason he/she was still attending school beyond the age limit. <u>See</u> <u>Id.</u> at 850-51. Concerned with the <u>Pottgen</u> approach, the <u>Washington</u> court held that an "individualized approach is [more] consistent

with protections intended by the ADA . . . . To require a focus on the general purposes behind a [school's] rule without considering the effect an exception for a disabled individual would have on those purposes would negate the reason for requiring reasonable exceptions." Id. at 852.

Years later, the Supreme Court in Martin endorsed application of an individualized inquiry under Title III of the ADA. In that case, the Court determined whether the PGA Tour, as a Title III public accommodation entity, was required to permit Martin, a professional golfer with a degenerative circulatory disorder that prevented him from walking excessively while playing, the use of a golf cart as a reasonable accommodation, despite the game's rule of prohibiting the use of such vehicles to gain a competitive edge. Martin, 532 U.S. at 664. The Court answered in the affirmative and found that in order to comply with the ADA, any policies, practices, or procedures of a public accommodation must be (1) reasonably modified for individuals with disabilities as necessary to afford access; (2) unless doing so would fundamentally alter what is offered. Id. at 682. In doing so, the Supreme Court mandated that an individual inquiry must be undertaken in making that determination.

While Martin's analysis concerned Title III of the ADA, its import, at least as to the individualized inquiry aspect of that decision, applies with equal force to Title II. See Cruz v. Pennsylvania Interscholastic Athletic Ass'n., 157 F.Supp. 2d. 485, 498-99 (E.D. Pa. 2001) ("in Martin, the Supreme

Court made clear that a basic requirement of the ADA is the evaluation of a disabled person on an individual basis."). In fact, <u>Martin</u>'s individualized review analysis in the context of a disability claim has been applied by courts in all three titles of the ADA. <u>See, e.g.</u>, <u>Kapche v. City of San Antonio</u>, 304 F.3d 493, 499-500 (5th Cir. 2002)(applying <u>Martin</u> in Title I employment case); <u>Jones v. City of Monroe</u>, 341 F.3d 474 (6th Cir. 2003) (applying <u>Martin</u> to a Title II challenge of the accessibility of a municipality's free parking spots); <u>Cruz</u>, 157 F.Supp. 2d. at 498 (applying the rationale of <u>Martin</u> to a Title II challenge to obtain a waiver from a high school athletic association's maximum-age eligibility requirement). Based on a review of cases decided since <u>Martin</u> and their rationales, this Court holds that the individualized review approach is consistent with the protections intended and contemplated by the ADA. Indeed, a failure to consider the circumstances of a disabled individual would vitiate the requirement of reasonably accommodating a particular disability; this is a highly fact-sensitive inquiry and requires a case-by-case analysis.[5]

With that framework in mind, I next turn to the elements of an ADA claim under Title II. To prevail on such a claim, a plaintiff must prove that (a) he has a disability within the meaning of the ADA, (b) he is otherwise

---

[5]

In fact, the parties do not dispute that the Court has to undertake an individualized review of the facts surrounding Anthony's disabilities and how these disabilities affected the Association's decision in providing Anthony reasonable accommodations.

qualified, with or without reasonable accommodations, to receive services or participate in programs or activities provided by his school, (c) he, by reason of his disability, was denied the benefits of, or excluded from participation in, such services, programs, or activities, or was discriminated against by the defendant, and (d) the defendant was a public entity within the meaning of Title II of the ADA . See Bowers v. N.C.A.A., 9 F. Supp. 2d 460, 475-478 (D.N.J. 1998); 42 U.S.C.A. § 12131(2) (ADA Title II definition of "qualified individual with a disability"). There is no dispute here that Anthony has a disability within the meaning of the ADA or that Association is a public entity. Rather, the thrust of the parties' arguments center on whether Anthony is "otherwise qualified" and "whether the Association excluded Anthony from participating in football "by reason of his disabilities." Thus, I shall confine my analysis to those two elements.

### A. Otherwise Qualified

Under Title II, an "otherwise qualified" or "qualified individual" is one with a disability, who with or without reasonable modifications to rules, meets the essential eligibility requirements for participation in programs or activities provided by a public entity. See Washington, 181 F.3d at 849. In the context of this case, resolution of this element turns on whether the waiver of the Association's rules would be a fundamental alteration to the purpose of those rules or would create undue financial and administrative burdens for the Association. Id. at 850. In other words, the inquiry is

whether a grant of a waiver would constitute a "reasonable accommodation."
See Johnson v. Florida High Sch. Activities Ass'n, Inc., 899 F.Supp. 579, 582
(M.D. Fla. 1995); Sandison v. Michigan High Sch. Athletic Ass'n, 863 F.Supp.
583, 488 (E.D. Mich. 1994); Lyon v. Illinois High Sch. Ass'n., No. 13-173,
2013 U.S. Dist. LEXIS 4314, at *8-9 (N.D. Ill. Jan. 10, 2013).

As a preliminary issue, in order to assess whether Anthony's
participation in competitive football for another year would fundamentally
change the nature of the game, both the Association and the Commissioner
urge this Court to defer to their findings on that subject. Plaintiffs, in
response, submit that I should review their ADA claims de novo. I note that
the issue of deference – in the context of this case – has not been addressed
by other courts.

A brief discussion of New Jersey's statutory scheme as it relates to
governing bodies of interscholastic sports is helpful. Pursuant to N.J.S.A.
18A:11-3, et seq., the Association, a non-profit, private organization,
coordinates and regulates the athletic programs of member school districts.
See B.C. v. Cumberland Reg'l Sch. Dist. and NJSIAA, 220 N.J. Super. 214,
234 (App. Div. 1987). By mandate of the statute, the Commissioner is
cloaked with the authority to approve the constitution, bylaws, rules and
regulations of the Association, and by doing so, those approved rules become
the policy of the Board of Education of each member school. N.J.S.A.
18A:11-3. Any final decision made by the Association can be appealed to the

Commissioner, with further appeal to the Superior Court. At each level of appeal, the Commissioner and the state court must accord deference to the Association's factual findings. The statutory provisions do not, however, make any reference to, or provide consideration of, the ADA.

The Commissioner maintains that I should apply the same level of deference to the Association's decision that would be accorded by the New Jersey state court on appeal. The Commissioner reasons that due deference is necessary because the Association interprets its own rules and regulations within its enforcing authority. However, the Commissioner's argument seemingly does not take into account this Court's independent obligation to assess the facts of this case through the lens of the ADA. As the ADA and the state statutes and the rules governing the Association serve different purposes, I cannot afford due deference to the Association's conclusions of law and findings of fact in analyzing this case under the ADA.

Admittedly, there is a line of cases in which courts have expressed a willingness to substantially defer to educators on decisions of academic and professional standards in the context of the ADA, see, e.g., Zukle v. Regents of the Unvi. of Cal., 166 F.3d 1041, 1047-48 (9th Cir. 1999); Halpern v. Wake Forest Unvi. Health Scis., 669 F.3d 454, 463 (4th Cir. 2012), because courts have limited ability to determine whether a student would meet reasonable standards for academic and professional achievement established by a particular university or school. It is, of course, logical that courts would look

to the decisions made by the particular institution regarding reasonable accommodations, because that institution would be in the best position to evaluate its own academic curriculum.[6] Simply put, affording substantial deference to an educator's decision at his or her educational institution rests on the degree of expertise of that educator. Here, the Association relies on these cases to argue that this Court should defer to the Association's findings on whether Anthony would be a difference-maker on the field, thereby chilling the competitive nature of the game. However, unlike educators in their particular academic settings, the Appeals Committee of the Association is comprised of principals, teachers, and others in the education profession who may have experience dealing with high school sports programs, but do not have the degree of expertise – as required by the cases above – to give substantial deference to the Association's determination regarding which student would be a difference-maker or the competitiveness of a particular player on the field. See Preliminary Hearing Tr., T9:25-T11:19. Because the Appeals Committee lacks that level of expertise, I reject the Association's position that substantial deference is warranted in this case.

---

[6]  Even in these cases, courts have consistently cautioned that "extending deference to educational institutions must not impede [courts'] obligation to enforce the ADA . . . . Thus, [courts] must be careful not to allow academic decisions to disguise truly discriminatory requirements. The educational institution has a real obligation to seek suitable means of reasonably accommodating a handicapped person and to submit a factual record indicating that it conscientiously carried out this statutory obligation." Zukle, 166 F.3d at 1048 (quotations and citations omitted).

That said, I acknowledge that under the New Jersey statutory scheme, the Association, while it is a non-profit organization, is akin to a state administrative agency under the auspice of the Commissioner of Education. In that regard, the State has tasked the Association with making interscholastic sports eligibility determinations and therefore, the Commissioner, and in turn, the state court, defer to the Association's decisions. In that light, I do find <u>some</u> degree of deference should be afforded to the Association's findings of fact, although not any conclusions of law.

Analogously, in IDEA cases, district courts apply a nontraditional standard of review when considering an appeal from a state administrative decision. <u>See</u> <u>D.S. v. Bayonne Bd. of Educ.</u>, 602 F.3d 553, 564 (3d Cir. 2010); <u>M.Z. v. Bethlehem Area Sch. Dist.</u>, No. 11-2887, 2013 U.S. App. LEXIS 6091, at *3-4 (3d Cir. Mar. 27, 2013). This review is sometimes referred to as modified <u>de novo</u> review, giving "due weight and deference to the findings in the administrative proceedings." <u>Id.</u> at 564. Accordingly, "[f]actual findings from the administrative proceedings are to be considered prima facie correct, and if the reviewing court does not adhere to those findings, it is obliged to explain why." <u>Id.</u> I find this type of deference regarding the Association's factual findings appropriate in this case because the Association is the state administrative governing body for the purposes of, <u>inter alia</u>, determining eligibility requirements in interscholastic high school sports. Thus, I will not defer to the Association's conclusions of law; rather,

I will conduct a <u>de novo</u> review of the elements necessary to establish an ADA claim. As to the findings of fact, I will apply the modified <u>de novo</u> review.

To begin, the focus of the reasonableness factor is whether Anthony's participation in competitive football would fundamentally alter the nature of the game. Having held a hearing on this issue, the Association found that Anthony is a difference-maker, and that allowing him to play would "provide his team with an actual competitive edge." Association Decision, p. 5. However, having reviewed the same record, which encompasses testimony from various witnesses, including Anthony's coaches, teacher and principal, as well as having heard additional testimony, I reject the Association's findings and conclude that the weight of the evidence favors Anthony on this issue. Thus, I find that Plaintiffs have demonstrated that they would likely prevail on the issue of whether a grant of a waiver would be a reasonable accommodation. The following is the Court's reasoning for departing from the Association's findings.

The Association first noted that Anthony is six foot two inches and 190 pounds, and therefore his age and size may pose a safety risk to other players on the football field in the event that Anthony may be forced to recover fumbled snaps or blocked kicks, which would lead to unanticipated contact. First and foremost, as the record reflects, as a place kicker, Anthony is in a non-contact role in a contact sport; consequently, the likelihood that Anthony would be engaged in any type of contact would be minimal. In fact,

Anthony's personal coach, Mr. McDonald, elaborated on his personal experiences as a place kicker: "I spent a lot of time kicking footballs in games and never in my eight years between high school and college did I ever get put in a situation where I was tackling somebody else as a kicker." Id., T57:25-T58:8. Unsurprisingly, to date, Anthony has never been involved in a blocked kick. Id., T58:10-14. Moreover, both Mr. Fillipone, Anthony's principal, and Coach Dahl gave assurances that Anthony would only be placed in games to kick extra points and field goals, and that he would not be placed in a position to punt or cover kicks. Id., T42:16-23; T58:22-T59:2. In addition, according to Mr. Starego, due to Anthony's autism, "he is prone to avoiding contact." See Tr. T57:s11-24. As to the issue of physical size, the Association failed to take into account the fact that other place-kickers are similarly built. For comparison, the rising senior year kicker, who Anthony replaced last year and with whom he would compete this year, is six foot four inches. Considering the totality of the circumstances, I find that the Association's safety concerns were unwarranted as there is no indication in the record that Anthony, merely because of his size, would place other players, or himself, in harm's way.

The Association also placed a significant emphasis on Anthony's athletic abilities. First, the Association found that, unlike other students, Anthony was coached by a professional, Mr. McDonald. For one, however, Mr. McDonald, currently a guidance counselor, is not a professional coach;

rather, Mr. McDonald's credentials come from his experience as a place kicker in high school and college. In addition, the instructions provided by Mr. McDonald were not extensive; Mr. McDonald testified that he only provided Anthony kicking instructions four to five times over the course of two or three months prior to the football season, totaling approximately four to five hours. See Tr. T82:1-10.

The Association further looked to Anthony's scoring statistics to conclude that he would be a difference-maker on the field. In his senior year, Anthony started in five games, and he scored, by kicking field goals and extra points, a total of 16 points. Regarding those points, against Toms River East, Anthony converted four extra points after touchdowns; against Lacey Township, Anthony kicked a 37-yard field goal in a game his team lost 6-3; and against Toms River North, he kicked a 22-yard field goal. Based on these statistics, the Association found that Anthony is an "above average" high school kicker. In its Decision, however, the Association failed to provide any reason why scoring those particular points or kicking a 37-yard field goal would elevate Anthony's athletic abilities above other high school kickers. Significantly, on that point, Mr. McDonald testified that Anthony's skills are the result of extreme hard work and that Anthony's participation as a place kicker on Brick's team will not "make or break the fate of the Brick football program over the next year . . . ." See Tr. T82:17-T83:5. Moreover, it is the opinion of Mr. McDonald that Anthony would not be able to play in Division

1 football because Anthony lacks certain athletic skills. Id., T83:12-20.
Likewise, Coach Dahl testified that allowing Anthony to play another year has
"nothing to do with" gaining an athletic advantage for the football team, but
rather, it is a chance for Anthony to "gain a developmental advantage." Id.,
T37:19-23.

The Association also placed significant emphasis on the claim, made
by Coach Dahl, that Anthony can kick a 50-yard field goal. Coach Dahl,
however, qualified his statement by clarifying that Anthony, even under
practice conditions, cannot consistently kick a 50-yard field goal, and that
Anthony has never kicked a 50-yard field goal in competitive games.
Anthony's longest kick in a game was a 37-yard field goal. See Tr. T45:18-
T46:7. Based on those statistics and representations from Anthony's
coaches, I find that the Association overstated Anthony's ability to greatly
enhance the team's competitiveness.

As for the Association's concerns regarding displacement of other
players, I note that there is a "no-cut" policy in place for the Brick Township
Football Team. In other words, no displacement of other players will take
place in the event Anthony receives a waiver. In addition, each kicker has to
earn the right to start by competing in team kick-offs. See Tr. T43:15-T44:7;
T37:6-18 ("there's no true guarantee Anthony will be the starting kicker.").
Indeed, to become the starting kicker, Anthony had to out-perform two other
kickers on the team. As Coach Dahl has explained, there is no guarantee

that Anthony would be the starting kicker in the upcoming season because other qualified kickers may replace Anthony during team kick-offs. See Tr. T.47:13-25. I do, however, appreciate that if Anthony successfully wins the starting kicker position, he would displace someone from that position. And, while that player would have to play a different position, he would not be "cut" from the team.

Lastly, I comment on Anthony's IEP for the 2012-1013 academic year (the "2012 IEP"), which was the only IEP available for review. Although there is some confusion as to whether the Association considered Anthony's past IEP during its deliberations, it is undisputed that there was no requirement in the IEP that Anthony must participate in sports. I note, however, the 2012 IEP did reflect in several sections that sports is a vital part of Anthony's developmental plan. For example, the 2012 IEP stated that because Anthony's interests and preferences include playing football, as a part of his community participation goal, Anthony would continue to participate in his high school football team. See IEP, p. 10. The 2012 IEP further emphasized this goal in the section of the IEP that sets forth Anthony's measurable post-secondary goals. See IEP, p. 13. Based on these goals, the 2012 IEP provided that the length of Anthony's school day during that academic year would vary in order to accommodate Anthony's participation in sports, and to that end, Anthony's core academics and programming during the 2012-2013 school year were scheduled to accommodate his participation. See IEP,

p. 20.

Regarding the consideration of undue burden, there is simply no evidence in the record that suggests that granting a waiver in this case would open the proverbial "flood gate" to others seeking similar waivers. Indeed, Defendants have not provided any evidence as to how often requests for waivers are received, let alone waivers from disabled students playing sports. Without any evidence in that regard, Defendants' position is speculative. Furthermore, the Association "already conducts individualized inquires into whether student athletes with physical impairments should receive a waiver; requiring such an analysis in disability cases will not be a significant additional burden." Washington, 181 F.3d at 852.

In sum, having carefully weighed the evidence and considered Anthony's individual circumstances – as I must – I depart from the Association's findings of fact and thus, come to the conclusion that granting Anthony a waiver would be a reasonable accommodation under the ADA. My decision in this regard is based partly on the fact that permitting Anthony to play another year would not run afoul of the stated purposes for the age and eight semester rules: there is no evidence of any type of red-shirting conduct, there is no threat of other students being displaced by Anthony, and finally, there are minimal, if any, safety concerns. More importantly, the weight of the evidence does not suggest that Anthony's participation in football would significantly change the nature and competitiveness of the game such that

providing a waiver would become unreasonable under the ADA.[7]

That said, Plaintiffs' request for injunctive relief rises and falls with the inquiry whether Anthony has been denied an opportunity to play competitive football, via a waiver of eligibility rules, by reason of his disabilities. Unfortunately for Plaintiffs, I answer that question in the negative.

## B.    By Reason of a Disability

The ADA's "by reason of language" requires the plaintiff to "demonstrate that, but for the failure to accommodate, he would not be deprived of the benefit he seeks." Muhammad v. Court of Common Pleas of Allegheny Cnty. Pa., 483 Fed. Appx. 759, 764 (3d Cir. 2012). When examining this factor, "[t]here must be a causal connection between the disability and [Anthony's] ineligibility." Washington, 181 F.3d at 848. Worded differently, Plaintiffs must present sufficient evidence to establish that the reason for Anthony's ineligibility is due to his disabilities, and if so, that a denial of a waiver of the eligibility rules constitutes a failure to accommodate his disabilities.

To begin, according to the Association's rules, the intent of a waiver is to equalize opportunities for students who are otherwise unable to meet the eligibility rules due to circumstances beyond their control. See Association

---

[7]    Having made these findings, I am constrained to note that if this case were brought as an appeal of the Association's decision – which it is not – limited to the issue whether the waiver was properly denied under the Association's rules governing eligibility, as opposed to an ADA discrimination case, the result might be different.

Decision, p. 3. This purpose falls in line with the ADA's aim to provide equal access for Anthony to play football like the rest of his teammates who do not have a disability. See Martin, 532 U.S. at 690. Significantly, the ADA does not provide Anthony additional opportunities because of his disabilities, but rather, the statute puts him on an equal footing with every other student player.

On this question, Defendants maintain that Anthony has been afforded the full benefit of participation in football because he has played football for four years. Indeed, the Association, in its decision, stated that Anthony's participation should be limited to four years of competition because allowing him to play a fifth year would provide a benefit to which other students are not entitled. Association Decision, p. 5. In so ruling, the Association cited to its Interpretative Guidelines which state, in relevant part, "waivers of the rules are never granted where it would allow a student to participate in more than four seasons in any one sport . . . ." Interpretative Guidelines, p. 50. There is no dispute that Anthony played four years of football beginning in his freshman year, and as such, the Association argues that based on this reason alone, Anthony's request for waiver was denied appropriately. The Association's position, however, does not analyze the issue of what is "participation" under the ADA.

The Interpretative Guidelines' language, quoted above, prohibits any student from playing additional years of football if he/she has "participated"

for four full years. This language fails to take into account any exceptions due to a student's disability and whether that disabled student meaningfully participated in the sports program. In my view, the absolute and prohibitive nature of the Guidelines in this context potentially defeats the purpose underlying the waiver rules – to provide ineligible students, because of circumstances beyond their control, with opportunities to participate in interscholastic sports. Similarly, such a position can be inconsistent with the mandate of the ADA.

The inquiry under the ADA is not limited to calculating the number of years for which Anthony played, but I must also determine whether Anthony's four years of participation in football were qualitatively similar to those students without a disability such that Anthony had equal access to, and meaningfully participated in, the football program despite his disabilities. Indeed, the Court focused on this question during the preliminary injunction hearing.[8] And, it is also as to this factor that Plaintiffs have failed to carry their burden. During that hearing, Plaintiffs offered the testimony of Mr. Marino, Anthony's freshman year coach, and Mr. Starego, Anthony's father, in order to show that Anthony's participation in Brick's football program during his freshman year was not meaningful; under the ADA, Plaintiffs argue, Anthony deserves to play, competitively, for another year.

---

[8]

Prior to the hearing, the Court instructed the parties to adduce additional evidence on this topic.

Mr. Marino testified at length that in terms of communication, during practices, Anthony initially kept to himself more so than other students, perhaps because of the nature of his disabilities. See Preliminary Hearing Tr. (P. Tr.), T23:16-22. But, as the year progressed, Anthony "got more accustomed to, more relaxed, he was more attentive to what was going on." Id. at T26:6-10. Recognizing Anthony's disabilities, Mr. Marino explained with "whatever drill [they] were doing that [Anthony] was matched up with equal or lesser ability players" on the field. Id. at T35:13-T36:1. Moreover, while Mr. Marino commented that Anthony's reaction time was slower than some others, the coach emphasized that every freshmen player starts slow and works his/her way through "so they get acclimated to what the sport is about on a high school level"; Anthony was no different in that regard. Id. at T36:19-23; T39:20-23 ("the beginning of the year [Anthony] shied away from [contact] . . . . As he progressed he got a little more comfortable with contact."). Moreover, and significantly, Mr. Marino testified that there were other players on the team who consistently performed worse than Anthony. See Id. at T73:1-19.

Mr. Marino also explained that he would find a position on the field that would suit each student's level of ability to ensure full participation. Id. at T70:16-18. In that connection, the coach did not treat Anthony differently than other students, and in fact, based on Anthony's skills at that time, he was assigned to two different positions on the team, as a wide-receiver and

a kicker. Id. at T71:21-T72:8. Notably, Mr. Marino remarked that there were other students who, comparatively, did not match Anthony's abilities. Id. at T69:14-T70:13. For example, there were three kickers during Anthony's freshman year, and based on Anthony's abilities, he was placed as Brick's second string extra point kicker, ahead of another kicker. Id. at T72:23-T73:4. As for playing time, Mr. Marino opined that Anthony's experience as a wide-receiver or kicker was no different than other students. Id. at T76:12-T77:10. Ultimately, Mr. Marino concluded that because Anthony made tremendous progress during his football career at Brick, he became the varsity kicker in his senior year, which is not atypical. Id. at T93:18-T94:18. The following exchange sums up Mr. Marino's impression:

> Q.   And did you as his freshman football coach endeavor to provide the opportunity for Anthony to develop his capabilities to the fullest extent?
>
> A.   Yes.
>
> Q.   You provided him with those opportunities?
>
> A.   Yes.
>
> . . .
>
> A.   Freshman year [Anthony] had a qualitative - he had qualitative instruction. He was involved. We kept him involved. We made sure – if they don't have a positive experience they are not going to go on and play three more years. Our jobs is to make sure that when they leave freshman they go and they want to play varsity three more years so that the program can build and get stronger. We give a positive experience [to Anthony] and I believe that everybody had the same positive experience though their freshman year.

P. Tr., T95:18-23; T99:14-24.

Mr. Starego, Anthony's father, testified. Mr. Starego talked generally about Anthony's disabilities and how they hindered his ability to play football during his freshman year. As a parent, Mr. Starego expressed his concerns regarding Anthony's safety on the field and his confidence overall. In that connection, Mr. Stargeo remarked that Anthony's capabilities, including his reaction time and communication skills on the field, as a result of his disabilities, were outmatched by his counterparts on the team. See Id. at T134:17-T135-10. While I believe that Mr. Starego testified candidly about his views of his son's experience, I nonetheless find Mr. Marino's testimony credible that Anthony did not significantly lag behind other members of the football squad, and his testimony further supports the fact that Anthony meaningfully participated in the football program beginning in his freshman year.

Based on the evidence presented at the hearing before the Appeals Committee, as well as the testimony before me, it is the opinion of this Court that Brick provided Anthony with the same opportunities afforded to every other student on the football team. Indeed, Brick and its coaches should be recognized for their sensitivity and efforts to ensure that Anthony experienced full and meaningful participation in the football program. Anthony's experience on the team reflects that he, like everyone else, struggled and persevered. In my view, Anthony's growth on the field from his freshman to

his senior year is akin to any other student's improvement in performance due to age, physical maturity, and experience. While it is certainly understandable that Anthony's disabilities would directly affect his playing abilities, that fact does not answer the legal issue at hand. It is apparent that Anthony's four year experience on the Brick High School football team was not qualitatively different than students without a disability and that he had full access to the program. Thus, his ineligibility to play competitive football a fifth year is not based upon his disabilities and therefore, I further find that the Association's decision to deny Anthony a waiver was not based on his disabilities. Accordingly, Plaintiffs have failed to carry their burden on a likelihood of success on the merits of their ADA claim.

Because Plaintiffs have failed to establish that they are likely to prevail on the merits of their ADA claim, I need not engage in an analysis of the remaining factors. See Conestoga Wood, 2013 U.S. App. LEXIS 15238 at *11-12. Plaintiff's motion for injunctive relief is denied.

## CONCLUSION

Anthony is a compelling young man. He has shown his community that, through hard work and perseverance, he can overcome the tremendous challenges of his disabilities. Without question, Anthony has matured both on and off the field because of the experiences he gained playing football. Indeed, there is no doubt that playing sports will continue to positively impact him. However, Plaintiffs have failed to show that the Association's

decision denying Anthony a waiver violates the ADA. Indeed, the Court's focus is on whether Anthony was provided with equal access and opportunity to play football afforded to every other student without a disability. That is the very essence of the ADA. And, I find that he was given such access and opportunity. I note, however, while Anthony can no longer play on the team competitively, he can continue to be a member by participating in practices and scrimmages with his teammates. Hopefully, in that new role, Anthony can further his personal and academic development.

Plaintiffs' motion for a preliminary injunction is **DENIED**.

**DATED**: September 9, 2013              / s/ Freda L. Wolfson
                                          **Freda L. Wolfson**
                                          **United States District Judge**